THE JEANERY, INC., an Oregon Corporation, and Rock Bottom Jean Co., Inc., an Oregon Corporation, Plaintiffs–Appellants,

v.

JAMES JEANS, INC., a Washington Corporation, Defendant–Appellee.

No. 85–3751.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1986.

Decided May 2, 1988.

As Amended June 2, 1988.

additional safeguards were needed for the "protection of the revenue." *Id.* at 3.

Justine Fischer, Stoll & Stoll, P.C., Portland, Or., for plaintiffs-appellants.

James H. Clarke, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or., for defendant-appellee.

Before ALARCON, REINHARDT and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The Jeanery, Inc., which is affiliated by common ownership with Rock Bottom Jean Co. (collectively referred to as "The Jeanery"), won a jury verdict in its antitrust suit against James Jeans, Inc., a clothing manufacturer. The Jeanery had alleged, and the jury found, that James Jeans conspired with other of its dealers to fix the resale price for James Jeans' products in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and that James Jeans terminated The Jeanery as one of its distributors because The Jeanery refused to sell its goods at the desired resale price. The jury awarded The Jeanery damages in the amount of $80,556.50, which the magistrate, sitting as a district court judge, *see* 28 U.S.C. § 636(c)(1), automatically trebled under section 4 of the Clayton Act, 15 U.S.C. § 15.

James Jeans then moved for a judgment notwithstanding the verdict ("JNOV") or in the alternative for a new trial. Upon reflection, the court concluded that there was insufficient evidence of a price-fixing conspiracy to submit to the jury and, accordingly, granted the motion for JNOV. The Jeanery appeals from this judgment, arguing that there was substantial evidence supporting the existence of a conspiracy to set resale prices in violation of the Sherman Act. The Jeanery also contends that it adequately proved it was injured by the alleged conspiracy, that the amount of damages it claimed was properly proven, and that the trial court erred by suggesting a dealer must show it made a firm offer to purchase goods, which the seller refused to accept, in order to establish termination.

We have jurisdiction of this appeal under 28 U.S.C. § 636(c)(3), and we affirm. Because we agree with the trial court's conclusion that there was insufficient evidence of conspiracy to submit the case to the jury, we do not reach The Jeanery's arguments regarding injury and damages. And for purposes of this appeal we accept The Jeanery's contention that James Jeans terminated it as a distributor.

## I

## FACTS

James Jeans manufactures, markets and distributes jeans and other casual pants under various trade names, including "James Jeans." From 1981 until early 1983, James Jeans' goods were a popular item in the Pacific Northwest, the region in which James Jeans conducted the majority of its business. Through employee sales representatives, James Jeans' merchandise was sold to retail outlets. Retail merchants purchased the goods through sales representatives who periodically visited their stores, or at semiannual trade shows where James Jeans displayed its wares. In the period relevant to this appeal, it was James Jeans' practice, which was consistent with industry practice as a whole, to suggest to retail merchants that the retail price should be an amount twice that paid by the retailer to buy the goods. This suggested resale price was known in the industry as the "keystone" markup. James Jeans made clear to retailers who purchased its goods that it wanted them to charge the full keystone price when the goods were resold to consumers, and that any retailer who sold below the suggested resale price would either be terminated as a distributor of James Jeans, or would not receive as favorable treatment from the manufacturer as would complying retailers. It is undisputed that James Jeans consistently explained this policy to all distributors who purchased its goods.

Tom and Chris Ballantyne own The Jeanery and Rock Bottom Jean Co. In September 1980, The Jeanery opened an account with James Jeans and began purchasing its merchandise. In May 1981, the Ballantynes began buying James Jeans' goods for sale at their Rock Bottom stores, which specialized in off-priced goods and factory seconds. The Ballantynes testified that the James Jeans' line was so popular during the 1981–1983 period that many of The Jeanery's customers would rather go to another store than purchase jeans other than James Jeans. Consequently, it was important to The Jeanery that it receive a

steady supply of James Jeans' merchandise.

The Ballantynes also testified that it was their practice to sell James Jeans at a price less than keystone markup. The Ballantynes were well aware that James Jeans discouraged distributors from discounting its goods in this manner. Indeed, on several occasions sales representatives of James Jeans either visited The Jeanery outlets or met with the Ballantynes at industry trade shows and told them that James Jeans was aware of The Jeanery's discounting practices and desired The Jeanery to price at keystone. The Jeanery, however, continued to price the goods it bought from James Jeans below the desired retail price.

Not surprisingly, other distributors of James Jeans who complied with the suggested retail price began to complain to James Jeans about The Jeanery's discounting. One of these complaints came from JJ's, one of James Jeans' best customers. Jim Lampus, the owner of JJ's, spoke with Hans Handwerk, a James Jeans representative, in April 1982, and expressed great dissatisfaction with The Jeanery's price cutting. Mr. Lampus threatened not to purchase any more goods from James Jeans unless James Jeans stopped selling to The Jeanery. Handwerk said that he would "take care of things." Several months later, in August 1982, Kris Nordstrom, another James Jeans representative, told the Ballantynes at the Seattle trade show that James Jeans would not accept any more orders from The Jeanery until Tom Ballantyne spoke with Handwerk about The Jeanery's pricing practices.

Rather than contact Handwerk, the Ballantynes contacted their attorney. When The Jeanery did not receive the jeans it had ordered from James Jeans for delivery in August 1982, the Ballantynes filed the present lawsuit against James Jeans alleging an illegal conspiracy among James Jeans and its other distributors to fix resale prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The Jeanery contended that James Jeans terminated it as a distributor because of its failure to adhere to the illegal price-fixing agreement, and that it suffered damages as a result. This appeal followed the trial court's judgment in favor of James Jeans notwithstanding the jury's verdict in favor of The Jeanery.

## II

### STANDARD OF REVIEW

We review a district court's grant of judgment notwithstanding the verdict by applying the same standard used by the district court. *Wilcox v. First Interstate Bank*, 815 F.2d 522, 524 (9th Cir.1987). JNOV is proper if " 'without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion —that the moving party is entitled to judgment notwithstanding the adverse verdict.' " *Id.* at 525 (citation omitted). Neither the trial judge nor this court is permitted to weigh the evidence or substitute its judgment for that of the jury, provided the jury verdict is supported by substantial evidence. *Id.*

■ The decision to grant a directed verdict or JNOV, for the standard in either context is identical, *compare Peterson v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir. 1985) (standard of review for JNOV), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), *with id.* at 1256 (standard of review for directed verdict), requires the trial court to engage in a careful reasoning process. In an antitrust case, if the evidence is entirely circumstantial, the court must decide whether a reasonable jury "could reach the suggested conclusion on the basis of the hard evidence without resorting to guesswork or conjecture." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *cf. Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985) (in antitrust case, when defendant moves for summary judgment, court must evaluate evidence in light most favorable to plaintiff and decide if jury could reach

guilty verdict without relying on "mere speculation, conjecture, or fantasy"). At the same time, the trial court must not encroach on the role of the jury in dispute resolution. *See Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1265 (9th Cir.), *cert. dismissed,* 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983); *Sweeney,* 637 F.2d at 115–16.

■ In the antitrust context, determining what amount of evidence will support a jury verdict and assessing the quality of the evidence from which an inference of illegal action may be drawn takes on a special importance. For a number of reasons, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). Consequently, the court must closely scrutinize the evidence in a given case to avoid the danger of improper antitrust condemnations. *See, e.g., id.* at 594, 106 S.Ct. at 1360 ("[M]istaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect."); *see Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984).

## III

## ANALYSIS

■ Section 1 of the Sherman Act declares illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The phrase "contract, combination, or conspiracy" has been interpreted to require concerted action of more than a single entity. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1261 (9th Cir.) (citing L. Sullivan, *Handbook of the Law of Antitrust* § 109 (1977)), *cert. dismissed,*

464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983). Unilateral conduct by a single firm, even if it "appears to 'restrain trade' unreasonably," is not unlawful under section 1 of the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984).[1] The reason for distinguishing between concerted and independent action is primarily one of economics. A single, "efficient firm may capture unsatisfied customers from an inefficient rival.... This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster." *Id.* (footnote omitted).

In two recent opinions, the Supreme Court has considered the distinction between concerted and unilateral action. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Court held that a parent corporation and its wholly owned subsidiary are not capable of conspiring with one another in violation of section 1 of the Sherman Act. *Id.* at 777, 104 S.Ct. at 2744. In reaching this conclusion, the Court discussed the unilateral behavior and concerted action distinction and observed that the Sherman Act treats concerted action more harshly than unilateral behavior for two reasons. First, "it is sometimes difficult to distinguish robust competition [by a single company] from conduct with long-run anticompetitive effects." *Id.* at 767–68, 104 S.Ct. at 2740. Accordingly, a single firm's conduct, absent the danger of monopolization, is not the object of intense antitrust scrutiny because to treat it with such scrutiny would heighten "the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." *Id.* at 768, 104 S.Ct. at 2740.

Second, concerted action poses a substantially greater risk of anticompetitive harm than does independent behavior. *See id.* at

---

1. Unilateral conduct may be unlawful under section 2 of the Sherman Act, 15 U.S.C. § 2, if the conduct threatens monopolization. *Copperweld,* 467 U.S. at 767, 104 S.Ct. at 2739.

By making a conspiracy to monopolize unlawful, § 2 does reach both concerted and unilateral behavior. The point remains, however,

that purely unilateral conduct is illegal only under § 2 and not under § 1. Monopolization without conspiracy is unlawful under § 2, but restraint of trade without a conspiracy or combination is not unlawful under § 1. *Id.* at 767 n. 13, 104 S.Ct. at 2739 n. 13.

768–69, 104 S.Ct. at 2740. "[Concerted action] deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id.* at 769, 104 S.Ct at 2740. Notwithstanding the efficiencies and potential benefits to consumers that may result from joint activities, "their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly." *Id.* The Court reasoned, however, that a parent and a wholly owned subsidiary cannot conspire together in violation of section 1 because they have "a complete unity of interest." *Id.* at 771, 104 S.Ct. at 2741. Coordination of their activities is necessary to efficient competition and promotes consumer welfare. *Id.* at 772, 104 S.Ct. at 2742.

In *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court considered the distinction between unilateral and concerted behavior in the context of a dealer termination case. Monsanto, a manufacturer of herbicides, terminated Spray–Rite as one of its dealers. Spray–Rite sued Monsanto alleging that Monsanto conspired with other of its dealers to fix resale prices and terminated Spray–Rite because it sold below the minimum resale price. *Id.* at 757, 104 S.Ct. at 1467. A jury found for Spray–Rite and awarded damages of $3.5 million, which was trebled to $10.5 million. Monsanto appealed, challenging the sufficiency of the evidence to support the verdict. The Seventh Circuit affirmed, holding that proof of termination following or in response to competitor complaints is sufficient to support an inference of concerted action. *Spray–Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1238–39 (7th Cir. 1982). The Supreme Court rejected the Seventh Circuit's view of the standard of proof, but affirmed the judgment under the Court's test for sufficiency of the evidence. 465 U.S. at 759, 104 S.Ct. at 1468. The Supreme Court considered what amount of evidence will support a jury finding of a vertical price-fixing conspiracy in violation of section 1 of the Sherman Act. *Id.* at 755, 104 S.Ct. at 1466.[2] To answer this question, the court reexamined its earlier decisions involving dealer terminations and vertical price-fixing conspiracies.

■ Two important distinctions emerge from these earlier cases. The first is that between concerted conduct and independent action, only the former is barred by section 1 of the Sherman Act. *Id.* at 761, 104 S.Ct. at 1469. Thus, under the *Colgate* doctrine, a manufacturer is free to announce resale prices and refuse to deal with dealers who sell below the announced price. *Id.* (discussing *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). The second important distinction is between concerted conduct to set prices and concerted conduct as to non-price restraints. *Id.* Concerted vertical price restraints have been held per se illegal since the decision in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).[3]

---

**2.** By "vertical," we refer to the situation in which a manufacturer imposes conditions on the sale of its goods by dealers or other parties in the distribution chain. *See* R. Bork, *The Antitrust Paradox: A Policy at War with Itself* 288 (1978). If a manufacturer also sells its own goods as a retailer, there is a horizontal element to the conduct. In our case, the manufacturer, James Jeans, sells its product solely to independent retailers who in turn resell the goods to the consuming public.

**3.** The per se rule of illegality is applied to those "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse

for their use." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Whether vertical price fixing should be per se illegal has been the subject of considerable judicial and scholarly debate. An abbreviated bibliography of this debate includes: *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761 n. 7, 104 S.Ct. 1464, 1469 n. 7, 79 L.Ed.2d 775 (1984) (collecting sources supporting proposition that "the economic effect of resale price maintenance is little different from agreements on nonprice restrictions"); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 69 & n. 10, 97 S.Ct. 2549, 2567 n. 10, 53 L.Ed.2d 568 (1977) (White, J., concurring); *Albrecht v. Herald Co.,* 390 U.S. 145, 151 n. 7, 88 S.Ct. 869, 872 n. 7, 19 L.Ed.2d 998 (1968); *Business Elec. Corp. v. Sharp Elec. Corp.,* 780 F.2d 1212, 1221–22 (5th Cir.1986) (Jones, J., concurring), *aff'd,* —— U.S. ——, 108 S.Ct. 1515, 99

In contrast, concerted vertical nonprice restraints are scrutinized for illegality under antitrust's rule of reason. *See Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469 (discussing *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)).

■ *Monsanto* and *Copperweld* set forth significant antitrust concepts. First, the rule of *Colgate* that a manufacturer can declare a resale price policy and refuse to deal with pricecutters is firmly entrenched in antitrust jurisprudence. *See Monsanto,* 465 U.S. at 761, 763, 104 S.Ct. at 1469, 1470. Second, because "a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination," *id.* at 761, 104 S.Ct. at 1469, proof of an agreement must "include[ ] more than a showing that the distributor conformed to the suggested price." *Id.* at 764 n. 9, 104 S.Ct. at 1471 n. 9. Third, an agreement to maintain prices may not be inferred from the fact alone that "a manufacturer and its distributors are in constant communication about prices and marketing strategy." *Id.* at 762, 104 S.Ct. at 1470. Finally, *Monsanto* cautions against permitting a jury to infer a concerted price-fixing agreement from highly ambiguous evidence. *Id.* at

763, 104 S.Ct. at 1470. Inferences drawn from weak evidence pose the danger of eroding the scope of conduct permitted by the *Colgate* doctrine or with respect to nonprice vertical restraints. *Id.; cf. Copperweld,* 467 U.S. at 768, 104 S.Ct. at 2740 (explaining that courts must carefully scrutinize allegations of concerted conduct to ensure that aggressive, procompetitive conduct of a single firm is not curtailed improperly).

■ A plaintiff does not establish an illegal price-fixing agreement solely by proof of complaints by competitors of the terminated dealer, or that the dealer's termination followed or was "in response to" these complaints, *Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470, or that the termination of a price-cutter was pursuant to an agreement with the complaining dealer. *Business Elec. Corp. v. Sharp Elec. Corp.,* —— U.S. ——, ——, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988).[4] Complaints about discounters "are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470. Price complaints provide a manufacturer with important information necessary "to assure an efficient distribu-

L.Ed.2d 808 (1988); R. Bork, *supra* note 2, at 280–98; Easterbrook, *Vertical Arrangements and the Rule of Reason,* 53 Antitrust L.J. 135 (1984); Flynn, *The "Is" and "Ought" of Vertical Restraints after Monsanto Co. v. Spray–Rite Service Corp.,* 71 Cornell L.Rev. 1095 (1986); Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6 (1981); Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision,* 45 U.Chi.L.Rev. 1 (1977).

4. *Monsanto* and *Business Electronics* call into doubt at least one of our earlier cases. In *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257 (9th Cir.), *cert. dismissed,* 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983), we considered the quantum of proof necessary to establish an illegal price-fixing conspiracy. *Id.* at 1261. Although Judge Wallace, who authored the opinion, presciently stated that "[s]omething more than complaints and termination must be shown [to prove an illegal conspiracy to set prices]," *id.* at 1263, we concluded that this "something more" could be supplied by the plaintiff showing "a *causal nexus* between complaints and termination." *Id.* (emphasis added). We criticized the Third Circuit for its statement in *Edward J.*

*Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 110 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), that a supplier's termination of a discounting retailer in response to complaints by other retailers was insufficient, standing alone, to show concerted action. *Filco,* 709 F.2d at 1265 n. 2. In *Monsanto,* however, the Supreme Court embraced the analysis in *Sweeney.* *See Monsanto,* 465 U.S. at 763–64, 104 S.Ct. at 1470. In *Business Electronics,* the Court held that an agreement between a manufacturer and a dealer to terminate another dealer for selling the manufacturer's goods at less than the manufacturer's suggested minimum resale price is not *per se* illegal without a showing of "a further agreement on the price or price levels to be charged by the remaining dealer." *Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1521. To the extent that *Filco* conflicts with *Monsanto* and *Business Electronics,* we are bound to follow the decisions of the Supreme Court.

*Filco* also concluded that a conspiracy can be shown by evidence of direct coercion by the manufacturer to ensure adherence to its resale price strategy. 709 F.2d at 1263. Whether this portion of *Filco* survives *Monsanto* and *Business Electronics* is explored *infra.*

tion system." *Id.* Thus, to prohibit a manufacturer from acting on price complaints "would create an irrational dislocation in the market." *Id.* at 764, 104 S.Ct. at 1470. Furthermore, imposing liability on a manufacturer who terminates a price-cutter after receiving price complaints " 'would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute.' " *Id.* (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 n. 2 (3d Cir. 1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).

Complaints by competitors are not entirely without probative value, however, in showing concerted action. *Id.* at 764 n. 8, 104 S.Ct. at 1471 n. 8. But a plaintiff must introduce "something more" than evidence of complaints and termination alone. *Id.* at 764 & n. 8, 104 S.Ct. at 1471 & n. 8. The plaintiff must produce "evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 764, 104 S.Ct. at 1471.[5] Moreover, more must be shown than simply an agreement between the manufacturer and a complaining distributor to terminate a price-cutter. *See Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1521. There must be "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471 (quoting *Sweeney,* 637 F.2d at 111). The "common scheme" or "meeting of minds," *id.* (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)), prerequisite to section 1 liability is not shown merely by a distributor's conformity to the suggested

resale price. *Id.* at 764 n. 9, 104 S.Ct. at 1471 n. 9. "It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* And, as the Supreme Court recently has emphasized, there must be evidence of an "agreement on the price or price levels to be charged...." *Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1521.

In *Monsanto,* the Court discussed the direct evidence that established the two elements of (a) a manufacturer seeking a resale price agreement and (b) a dealer communicating its acquiescence to the proposed agreement. The Court observed that after Monsanto terminated Spray–Rite, Monsanto threatened not to supply its new herbicide to price-cutting distributors who did not adhere to the announced resale price. *Monsanto,* 465 U.S. at 765, 104 S.Ct. at 1471. When one discounter refused to follow the resale price policy, Monsanto complained to the distributor's parent company. The parent company in turn put pressure on the discounter to comply, and the discounter subsequently informed Monsanto that it would sell Monsanto's goods at the suggested price. *Id.* Through these events, the Court concluded a jury could find that Monsanto had sought a price-fixing agreement and had received the distributor's communicated acquiescence. *See id.* The section 1 violation of the Sherman Act was complete. *See id.* at 764 & n. 9, 104 S.Ct. at 1471 n. 9.

In the present case, although the plaintiff distributor, The Jeanery, does not explain who joined with James Jeans in the alleged illegal conspiracy, it seems reasonably clear that the claimed conspirators are James Jeans and some of its other distributors.[6] The content of the conspiracy is

---

5. As the Eleventh Circuit has put it, "[t]his evidence need not be such that *only* an inference of conspiracy may be derived from it. It must, however, go beyond equivocal complaints and *tend* to exclude the inference of independent action." *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.,* 818 F.2d 1530, 1534 n. 4 (11th Cir.1987) (emphasis in original).

6. There is evidence in the record that on several occasions, an employee of James Jeans met or sought to meet with the owners of The Jeanery to discuss The Jeanery's persistent price cutting. At one of these meetings, Kris Nordstrom, a James Jeans sales representative, offered to provide The Jeanery with off-priced goods and factory seconds for its discount outlets if The Jeanery would agree to sell a new line of James Jeans' goods at the desired retail price. There is

alleged to be one to illegally fix resale prices. There is evidence that in response to a price complaint by JJ's, one of James Jeans' best customers, James Jeans stopped supplying its product to The Jeanery. We have previously stated "that if a manufacturer deliberately withdraws its product from a price-cutting distributor at the request of a competing distributor as part of a conspiracy to protect the requesting distributor from price competition, the manufacturer has committed a per se violation of the antitrust laws." *Zidell Explorations, Inc. v. Conval Int'l, Ltd.*, 719 F.2d 1465, 1469 (9th Cir.1983) (discussing *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979)); *see also O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir.1986) (following *Zidell* but finding insufficient evidence of conspiracy); *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1015 (9th Cir.) (following *Cernuto* but finding insufficient evidence of conspiracy), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed. 2d 109 (1983). We have also explained that when a manufacturer terminates a price-cutter "in response to a competing distributor's complaint and with intent to restrain price competition," a section 1 Sherman Act violation has been stated. *Zidell*, 719 F.2d at 1470.

*Monsanto* and *Business Electronics* draw into question our decision in *Zidell*. In *Monsanto*, the Court clearly stated that dealer complaints and a responsive termination by a manufacturer are not sufficient, standing alone, to raise an inference of conspiracy. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). The Third Circuit in *Cernuto*, which we applied in *Zidell*, condemned responsive dealer terminations because they reflect a "restraint ... primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier." *Cernuto*, 595 F.2d at 168. Although this may be the motive behind the price complaint, *Monsanto* makes clear that so long as the manufacturer makes an independent business decision to terminate a price cutter, the fact that a complaint preceded or precipitated the termination is of no moment. *See Monsanto*, 465 U.S. at 763–64, 104 S.Ct. at 1470.[7] To hold otherwise and impose anti-

---

evidence that The Jeanery accepted this offer. Although The Jeanery argued at trial that this evidence established an agreement to set prices, and requested a jury instruction to this effect, the requested instruction was refused by the trial court. The Jeanery does not argue on appeal that the trial court erred in refusing to give the requested instruction. Indeed, its position on appeal is one in support of the jury's verdict. The jury returned a general verdict. Because the jury was not instructed that liability might be imposed if it found an agreement between James Jeans and The Jeanery to fix the resale price, we must assume that its general verdict does not include such a finding. *Cf. Husky Refining Co. v. Barnes*, 119 F.2d 715, 717 (9th Cir.1941) (explaining that "it is to be assumed in the absence of a showing to the contrary that the direction of the court was followed").

The Jeanery did not argue, in opposition to the motion for JNOV, that the jury's verdict could have been based on finding the existence of an agreement between it and James Jeans. Nor does The Jeanery present this argument in any fashion in this appeal. Consequently, it is not necessary to decide whether the plaintiff has proved an *Albercht*-type of conspiracy. *See Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968) (sug-

gesting that retailer acquiescence in a manufacturer's demand makes it the second party to a conspiracy). Nor is it necessary to decide if this portion of *Albrecht* survives the teaching of *Monsanto* that "a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Monsanto Co. v. Spray-Rite Serv. Co.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Like the Court in *Monsanto*, "[w]e ... decline to reach the[se] question[s], and we decide the case in the context in which it was decided below and argued here." *Id.* at 762 n. 7, 104 S.Ct. at 1470 n. 7.

7. We have suggested in other cases that antitrust liability may depend on whether a manufacturer's primary motive in terminating a dealer was anticompetitive. *See, e.g., O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir. 1986) (citing with approval *Zidell Explorations, Inc. v. Conval Int'l, Ltd.*, 719 F.2d 1465, 1469 (9th Cir.1983)). The validity of this approach to antitrust liability is placed in doubt by the Supreme Court's *Monsanto, Copperweld, Matsushita* and *Business Electronics* decisions. These decisions reflect a more sophisticated use of economic analysis in antitrust cases than has previously been seen. Easterbrook, *supra* note 3, at 170–71. In line with this economic awareness, a court should be less concerned with

trust liability on a manufacturer who acts after a price complaint would create the type of irrational dislocation in the market that *Monsanto* sought to prevent. *See id.* at 764, 104 S.Ct. at 1470. Moreover, the recent *Business Electronics* decision emphasizes that a manufacturer does not commit a *per se* violation of the antitrust laws by entering into an agreement with a requesting distributor to terminate a price-cutter, "unless [the agreement] includes some agreement on price or price levels." *Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1525.[8]

In analyzing The Jeanery's evidence, we must be mindful of the Supreme Court's warning that the plaintiff must be given "the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), *quoted in Wilcox v. First Interstate Bank,* 815 F.2d 522, 526 (9th Cir.1987). But in scrutinizing the evidence, we also must make certain that only reasonable inferences from sufficient evidence are drawn by the factfinder. Although a trial court should proceed cautiously in granting a motion for JNOV, *see Peterson v. Kennedy,* 771 F.2d 1244, 1252 (9th Cir.1985), *cert. denied,* 475 U.S. 1122,

106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), the court cannot forget that antitrust law places limits on the inferences that may be drawn from circumstantial evidence. *Wilcox,* 815 F.2d at 525 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986)).

The Jeanery's evidence consists of (1) competitor complaints about The Jeanery's persistent price cutting; (2) a strongly phrased complaint by JJ's, a major customer of James Jeans, coupled with James Jeans' statement that it would "take care of things"; (3) allegedly coercive tactics used by James Jeans to enforce adherence to its pricing policy; and (4) the alleged absence of a plausible business justification for James Jeans' decision to terminate The Jeanery. Taken as a whole, this evidence is insufficiently probative of a conspiracy to permit the case to go to a jury.[9]

### A. Competitor Complaints

There is evidence in the record that James Jeans received, at most, four complaints about the plaintiff's refusal to retail at "keystone." Complaints by competitors, standing alone, are not sufficient to show a conspiracy. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). Neither

---

subjective notions of motive and more concerned with the economic effect of challenged conduct. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588–95, 106 S.Ct. 1348, 1357–60, 89 L.Ed.2d 538 (1986) (analyzing the economic arguments against a predatory pricing conspiracy and concluding that "economic realities tend to make predatory pricing conspiracies self deterring"); *Monsanto,* 465 U.S. at 762, 104 S.Ct. at 1470 (observing that "the economic effect of ... unilateral and concerted vertical price setting, agreements on price and nonprice restrictions ... is in many, but not all, cases similar or identical").

8. In *Business Electronics,* the Court noted that our decision in *Zidell* conflicted with the holding of the Fifth Circuit which it affirmed. *Business Elec.,* —— U.S. at ——, n. 1, 108 S.Ct. at 1517, n. 1.

9. The dissent argues that this conclusion is at odds with *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

We do not agree. As the Court stated in *Business Electronics:*

> In *Parke, Davis,* a manufacturer combined first with wholesalers and then with retailers in order to gain "the retailers' adherence to its suggested minimum retail prices." 362 U.S., at 45–46, and n. 6, 80 S.Ct. at 512, and n. 6. The manufacturer also brokered an agreement among its retailers not to advertise prices below its suggested retail prices, which agreement was held to be part of the *per se* illegal combination. This holding also does not support a rule that an agreement on price or price level is not required for a vertical restraint to be *per se* illegal—first, because the agreement not to advertise prices was part and parcel of the combination that contained the price agreement, *id.,* at 35–36, 80 S.Ct. at 507, and second because the agreement among retailers that the manufacturer organized was a *horizontal* conspiracy among competitors. *Id.,* at 46–47, 80 S.Ct. at 512–13.

*Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1525 (emphasis in original).

is it probative of a price-fixing conspiracy that The Jeanery was terminated after, or in response to, the complaints. *Id.* Furthermore, the volume and frequency of competitor complaints does not affect this analysis; "something more" still must be shown by the plaintiff. *See id.* at 764 & n. 8, 104 S.Ct. at 1471 & n. 8.

### B. *Major Customer's Complaint Coupled with James Jeans' Response*

Deposition testimony introduced at the trial reveals the following exchange between Jim Lampus, the owner of JJ's, and the witness, Hans Handwerk, a sales representative employed by James Jeans.

Question to Hans Handwerk, the James Jeans representative: OK, And what did Mr. Lampus [JJ's owner] tell you about the Jeanery?

Answer: "Hans, we've got a guy right across from me that's selling your product for $5.00 off all the time."

Question: "Okay, and what was your response to Mr. Lampus?

Answer: "Okay, do I—who is it?"

Question: And what did he say?

Answer: I don't specifically recall saying who it was, I found out who it was at that time but I don't recall specific words that he said.

Question: Okay. Did Mr. Lampus ask you to do something about it?

Answer: Yes.

Question: And what did he ask you to do?

Answer: "Make a decision."

Question: What did you understand that to mean?

Answer: Well he then asked me, he said, "make a decision," and he said, "if you sell him, I'm not going to buy the product."

Question: And what did you tell him?

Answer: I said, "Jim, don't worry about it, I'll take care of things."

Further evidence revealed that Handwerk reported this conversation to Mr. Krause, the owner of James Jeans, who told Handwerk to "take care of it."

Taken in context with the other price complaints, Handwerk's statement to JJ's owner that he would "take care of things" reflects nothing more than an effort by a manufacturer to calm an angry customer. Moreover, the vague statement by Handwerk that he would "take care of things" falls far short of establishing an agreement to fix prices between the manufacturer and the complaining retailer. Neither does it tend to prove an agreement to terminate a retailer who has failed to follow the alleged resale price maintenance scheme. James Jeans' owner's instruction to Handwerk to "take care of" JJ's complaint also does not establish any agreement. James Jeans, in response to the complaint, could have simply terminated The Jeanery as a distributor. Instead, James Jeans tried to "take care of things" by resolving the problem with The Jeanery, and when that failed The Jeanery was terminated, almost five months after JJ's price complaint. Finally, even if this evidence were sufficient to support the finding of an agreement between James Jeans and JJ's to terminate The Jeanery, it is insufficient to establish "some agreement on price or price levels," without which "a vertical restraint is not illegal *per se.*" *See Business Elec.*, —— U.S. at ——, 108 S.Ct. at 1525.

### C. *Coercive Tactics to Enforce Price Policy Adherence*

The Jeanery argues that it presented evidence of "coercive" conduct by James Jeans. This argument seems to be constructed on the statement in our *Filco* case that evidence of "overt coercion attempting to ensure compliance through threats or demands" is "something more" than merely complaints and termination and allows an inference of concerted action. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1263 (9th Cir.), *cert. dismissed*, 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983). But in *Filco*, we also explained that demands or threats are to "be distinguished from mere 'exposition, persuasion, argument, or pressure.'" *Id.* (quoting *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 53 (2d Cir. 1980)). In deciding how to categorize

statements made by James Jeans, we look to the context in which they were made. *Id.*

One retailer, Scott Wilson, testified that James Jeans told him that James Jeans would like to have its goods sold at keystone. At trial, Wilson testified:

Question: Was there any indication to you what would happen if you did not keystone?

Answer: They intimated the fact that they would be—we'd have difficulty getting them in the future.

Question: All right. Did you in fact sell at a discount price the James Jeans?

Answer: We have always done that, yes.

. . . .

Question: And did you have any difficulty getting merchandise from James Jeans?

Answer: Extreme.

■ Given that the manufacturer has every right to set the price at which it wants its goods resold and to terminate a dealer who undercuts that price, it is not surprising that a manufacturer would let a dealer know this policy. The greatest "difficulty" a dealer could experience in getting a product would be to suffer a termination. Certainly, then, a manufacturer may advise a dealer that its policy is to terminate a dealer who does not sell at keystone, or to favor filling orders placed by complying dealers. This is legitimate pressure to get a dealer to sell at keystone. No inference of antitrust conspiracy can be drawn from such evidence. It is ambiguous at best. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) ("[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.*, at 764 [104 S.Ct. at 1470].").

Testimony by other retailers of James Jeans is equally equivocal. Judith Grant, the owner of Jeans & Things, testified to the following exchange with Kris Nordstrom, one of James Jeans' sales representatives.

Question: And could you describe those conversations please?

. . . .

Answer: Well, when I asked them about the other stores in Yakima that did discount, they said that technically they could not refuse to sell to anybody they had already opened an account for. But they could—they did have ways of stopping anybody else from discounting them.

. . . .

Question: Did Mr. Nordstrom ever tell you, describe to you any of the ways that they had to deal with this problem of discounting?

Answer: Well, what was said to me was, "Orders could be lost, could be shipped to the wrong destination, or just never processed."

This again reveals nothing more than James Jeans putting pressure on a retailer to adhere to its resale price policy. It is consistent with the privilege of independent action permitted a manufacturer under *Colgate.*

D. *Plausible Business Justification to Terminate The Jeanery*

■ The Jeanery argues there was no evidence of any business justification for James Jeans to terminate it as one of James Jeans' distributors. The Jeanery contends this lack of business justification, coupled with its termination in response to JJ's complaint, is sufficient circumstantial evidence of a price-fixing conspiracy to permit the case to go to the jury. We disagree. A manufacturer may terminate a dealer who violates the manufacturer's retail price policy. If any business justification is needed for such a termination, it is supplied by the manufacturer's business judgment that it is important to its marketing strategy and the maintenance of its dealer network not to have its goods sold at less than the suggested retail price.

"[A] manufacturer's strongly felt concern about resale prices does not necessarily mean that it has done more than the *Colgate* doctrine allows." *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470. *Business Electronics* teaches that a manufacturer can agree to terminate a price-cutting distributor in response to a complaint from another dealer. It is uncontroverted in the present case that The Jeanery's price-cutting practices created problems between James Jeans and some of its other distributors. One of these distributors was JJ's, one of James Jeans' best customers. Faced with this situation, James Jeans exercised its business judgment and terminated The Jeanery. We see no absence of business justification in this course of action. Indeed, in *Business Electronics* there also was lacking any evidence of a plausible business justification for the termination, other than the manufacturer's desire to retain the business of an important customer. *See Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1527 (Stevens, J., dissenting).

## IV

### LACK OF COMMUNICATED ACQUIESCENCE

If we were to treat James Jeans' statements to its retailers as requests for an agreement to sell at keystone; or if we were to treat as coercive threats its statements to its retailers that James Jeans products could be lost, delayed or misshipped if a retailer did not agree to sell at keystone, the record still does not support the finding of any agreement. Regardless of James Jeans' conduct, to establish an agreement it takes two to tango.

In *Monsanto*, the Court indicated that the threat to cut off supplies was "circumstantial evidence that Monsanto sought agreement from the distributor to conform to the resale price." 465 U.S. at 765 n. 10, 104 S.Ct. at 1471 n. 10. From this circumstantial evidence of threats, "[t]he jury could have concluded that Monsanto sought this agreement at a time when it was able

to use supply as a lever to force compliance." *Id.* The Court further found an illegal agreement based upon "substantial *direct* evidence" of Monsanto's unsuccessful efforts to force distributor compliance by threats of short supplies during a peak shipping season followed by Monsanto's appeal to the distributor's parent company, which resulted in the distributor reluctantly "inform[ing] Monsanto that it would charge the suggested price." *Monsanto Co. v. Spray–Rite Serv. Co.*, 465 U.S. 752, 765, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (emphasis in original).

■ A plaintiff does not establish concerted action, however, merely by proving that the defendant sought agreement. More is required. "The concept of 'a meeting of the minds' ... means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* at 764 n. 9, 104 S.Ct. at 1471 n. 9. In *Monsanto*, there was evidence of communicated acquiescence by the distributor. *See id.* at 765, 104 S.Ct. at 1471 n. 9. Here, there isn't. There is no evidence that the retailers James Jeans requested, or pressured, to sell its product at keystone communicated acquiescence to such an agreement. Some dealers sold at keystone; some did not. The Jeanery did not, and it was terminated as a dealer. This termination was pursuant to James Jeans' announced policy as reiterated in its conversations with its dealers. But there is no evidence that this termination was pursuant to any agreement.[10] It was unilateral, independent action taken by James Jeans to maintain the resale price of its goods. And it did not violate section 1 of the Sherman Act.

## V

### CONCLUSION

The Supreme Court has cautioned against letting unsupported allegations in

---

10. Even if the evidence were sufficient to establish an agreement between James Jeans and JJ's to terminate The Jeanery, there is no evidence

this alleged agreement included "some agreement on price or prive levels." *Business Elec.,* —— U.S. at ——, 108 S.Ct. at 1525.

an antitrust case reach a jury. *See Matsushita*, 475 U.S. at 593, 106 S.Ct. at 1360; *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1360. The present case rests on circumstantial evidence that does not support a reasonable inference of concerted behavior. Evaluating the evidence in the light most favorable to The Jeanery, we conclude that a jury could find a violation of section 1 of the Sherman Act only by relying on speculation or conjecture. *See Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Accordingly, we affirm the judgment of the trial court in favor of James Jeans on its motion for judgment notwithstanding the verdict.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

A jury found that James Jeans, Inc., had violated the antitrust laws by unlawfully terminating one of its dealers, The Jeanery, Inc., and awarded damages. The trial court, relying primarily on *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), granted a judgment *non obstante veredicto* in favor of James Jeans. The majority issued an opinion affirming the district court, in which it concluded, on the basis of *Monsanto*, that The Jeanery did not offer sufficient evidence for a jury to find that an antitrust violation had occurred—specifically, that there was insufficient evidence of an *agreement to terminate* its franchise. Because I disagreed with the majority's interpretation and application of *Monsanto*, and its failure to follow an earlier Supreme Court opinion, *United States v. Parke, Davis*, I filed a dissent. After the majority and dissenting opinions were issued, the Supreme Court decided *Business Electronics Corp. v. Sharp Electronics Corp.*, —— U.S. ——, 108 S.Ct. 1515, 99

L.Ed.2d 808 (1988). The majority then prepared an amended opinion, adding an additional ground for its conclusion—namely, that there was insufficient evidence of a *price-specific agreement.* I still dissent, and will discuss the two bases for my disagreement separately.

## MONSANTO AND THE AGREEMENT TO TERMINATE

*Monsanto* reaffirmed and elaborated the holding of *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The point of *Colgate* was that manufacturers have a qualified privilege to choose the firms with which they will deal. A manufacturer may state in advance that it will not sell to a price-cutting dealer, and then follow through with that resolution. *Colgate*, 250 U.S. at 307, 39 S.Ct. at 468. *Monsanto* stated that it followed from the holding in *Colgate* that a manufacturer's termination of a price-cutting firm after complaints from the firm's competitors *might* still be a legal unilateral action. *Monsanto*, 465 U.S. at 763–64, 104 S.Ct. at 1470. As *Monsanto* stated, the competing firms' complaints *might* simply have provided the manufacturer with information which formed a basis for its decision to enforce its earlier resolution regarding which firms it would deal with. *Monsanto*, 465 U.S. at 763–64, 104 S.Ct. at 1470. Under *Monsanto*, "something more" is needed beyond evidence of a complaint and a termination to show that the manufacturer's action was illegal (part of a combination) rather than legal (unilateral action). *Id.* at 764, 104 S.Ct. at 1470. *Monsanto* discussed this "something more" as including direct or circumstantial evidence that "tends to exclude the possibility" that the alleged conspirators acted independently, or, put alternatively, that reasonably tends to prove "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.[1] In other words,

---

1. The Court in *Monsanto*, after reviewing the additional evidence present in that case, found "something more" and accordingly, affirmed the Court of Appeals, 465 U.S. at 764–68, 104 S.Ct.

at 1470–72. The key evidence was a statement to Monsanto by a distributor that it would maintain the retail price. There was also a rather ambiguous newsletter from another distributor

there must be additional evidence that tends either to prove concerted action or to disprove unilateral action.

While *Monsanto* gave some indication of what this "something more" could be, more guidance on this question can be found in other Supreme Court cases, in particular, from one leading case which the majority, remarkably, does not even mention except in a footnote. In *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43–44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the manufacturer had an announced policy of ceasing to do business with wholesalers who failed to comply with its specified retail price.[2] The Court, in finding an antitrust violation, explicitly reaffirmed *Colgate. Parke, Davis*, 362 U.S. at 44, 80 S.Ct. at 512. However, the Court stated,

> When the manufacturer's actions ... go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration [the qualified privilege to choose trading partners, protected by *Colgate* ] is not present and therefore he has put together a combination in violation of the Sherman Act.

*Id.* It is in the majority's refusal to apply *Parke, Davis* that I most strongly part company with its legal analysis.

The Supreme Court has never given much guidance on how courts determine whether an unlawful combination exists for the purpose of Section 1. Possible theories that have received some support in the case law vary from the weaker requirements of an "implied acceptance theory" or a "coerced compliance theory" to the more rigid requirement of an express agreement. *See* 7 P. Areeda, *Antitrust Law* 8–180 (1986). The majority seriously overstates the extent to which the Court's decision in *Monsanto* has clarified—or narrowed—the criteria for determining whether there was an unlawful combination, by suggesting that an express agreement is necessary.[3] I think the more accurate reading of the relevant cases is that offered by Professor Areeda. He reads *Monsanto* as merely maintaining a distinction between simple and complex refusals to deal. A mere announcement and termination is a legal, unilateral action. However, when firms use individualized negotiations with dealers, meetings, repeated exhortations, and intermediate pressures, such actions indicate illegal, concerted action.[4] 7 P. Areeda, *Antitrust Law* 82–180 (1986). All of these factors were present in this case. It is important to note also that this case involves not merely a manufacturer's coercion of its dealers to control the dealers' prices. Here, a competing dealer (JJ's) had also threatened the manufacturer, trying (apparently successfully) to force the manufacturer to enforce the resale price levels. As Professor Areeda has argued, as a matter of antitrust policy, courts should be less tolerant of the efforts of dealers to control their competitors through the manufacturer than they are of manufacturer efforts to control dealer prices. 7 P. Areeda, *Antitrust Law* 175 (1986).

---

to his dealer-customers. In *Monsanto*, the "something more" was in actuality not very much. *See* Easterbrook, "Vertical Arrangements and the Rule of Reason", 53 *Antitrust L.J.* 131, 171–72 (1984).

**2.** I note that *Monsanto* does not in any way signal a retreat from *Parke, Davis*. In fact, in its opinion, the *Monsanto* court cited *Parke, Davis* at two separate points. *See Monsanto*, 465 U.S. at 761, 762, 104 S.Ct. at 1469, 1470.

**3.** One commentator has stated: *"Monsanto* clearly does not adopt the implied acceptance or the coercion theory of agreement, but it may not entirely reject them either. Taking *Colgate* as given, the Court did not pursue agreement concepts." 7 P. Areeda, *Antitrust Law* 83 (1986).

**4.** Professor Areeda stated:

> I do not mean to imply that suggestions or persuasion standing alone can be treated as agreements. Rather we are focusing on persuasion and exhortations (etc.) in the context of threatened termination. In this context, I would treat these additional steps as "complex." As *Parke Davis* pointed out, such a manufacturer is not merely choosing congenial dealers in the sense of those who prefer to comply in order to get the goods—he is trying to get compliance without bearing the burden of termination. Such steps approach a seeking of dealer assent to a much greater degree than simple announcement of conditions and termination of non-conformists.

7 P. Areeda, *Antitrust Law* 116–17 (1986).

Here, as in *Monsanto*, there was more than merely a customer complaint followed by a dealer termination. The record before us contains more than enough additional evidence for a jury to have concluded that (1) there was an unlawful combination to maintain the resale price of James Jeans' jeans and (2) The Jeanery was terminated as a result. There is ample evidence that in its dealings with retailers in general James Jeans went well beyond announcing a policy of refusing to deal with price-cutting merchants and terminating those who sold at discount. There is also ample evidence that in the particular act of terminating the Jeanery James Jeans did not, as permitted by *Monsanto*, simply enforce a preexisting policy in response to information it gained through a customer's complaint.

The record before us reveals direct evidence of an agreement in restraint of trade —an express oral agreement between James Jeans and JJ's, one of its major accounts. According to the testimony of Handwerk, a James Jeans sales representative, the owner of JJ's told Handwerk that he must stop selling to The Jeanery or he would lose JJ's business; Handwerk immediately assured JJ's owner that he would "take care of things"; when Handwerk reported to the president of James Jeans, he was told to do just that; Handwerk filled in another sales representative, Nordstrom. It was Nordstrom who then cut off The Jeanery, as JJ's had demanded. Handwerk's testimony is direct and substantial evidence from which a jury could reasonably conclude that there was an agreement between JJ's and James Jeans to terminate a price-cutting dealer. Certainly a jury could find that Handwerk's response constituted an assent, or at least a communicated acquiescence in JJ's demand.[5] *See Monsanto*, 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9.

The majority reads *Monsanto* and *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in such a way as to create, in effect, a "beyond all reasonable doubt" standard for finding a Section 1 agreement. The majority's argument, reduced to its simplest form, is that there is a plausible reading of the evidence that would be consistent with legal, independent behavior, and therefore plaintiff's case must fail.[6] *See* maj. at 1157–59. I think this approach to evaluating evidence reads the relevant Supreme Court cases far too narrowly. What the Supreme Court stated was that an antitrust plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could have harmed respondents." *Matsushita*, 106 S.Ct. at 1357. It is clear that The Jeanery has met this standard. Any stricter reading of the Supreme Court cases interferes with the jury's fact-finding function. That evidence may not entirely preclude an interpretation of independent action does not warrant taking the case from the jury.

The evidence here, unlike the type of evidence that *Monsanto* said would be insufficient, is *direct* in character. Handwerk's testimony relates to the agreement itself, not to other facts from which an

---

5. The majority characterizes this same exchange as "reflect[ing] nothing more than an effort by a manufacturer to calm an angry customer." Maj. at 1158. Though this may be a plausible interpretation of the exchange, interpreting the exchange as evidence of an agreement seems far more probable. In any event, the majority oversteps its role when it announces that the exchange "falls [so] far short of establishing an agreement" that the question should not even go to the jury. Maj. op. 1158. In effect, the district court, and the majority, simply arrogated unto themselves the fact-finding function of the jury.

6. The majority's analysis seems to proceed from precisely the opposite premise set forth so persuasively by the Third Circuit when discussing antitrust conspiracies over forty years ago: "The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age." *William Goldman Theatres v. Loew's, Inc.*, 150 F.2d 738, 743 n. 15 (3d Cir.1945). Nowadays, because price-fixing agreements are *per se* illegal, antitrust conspirators tend to be perceptive enough to avoid express written agreements and to deny the existence of any combination or conspiracy; they also tend to avoid leaving incriminating evidence lying about.

1164

agreement might be inferred. While conceivably one could argue that Handwerk's response meant something different than acquiescence, the meaning of the statement was clearly a matter for the jury to decide.[7] In *Monsanto,* the plaintiffs sought to have the jury *infer* an agreement from the circumstantial fact that a dealer was terminated following another dealer's complaint. Here the plaintiff asked only that the jury find that the exchange of statements itself constituted an agreement or, at the least, resulted in a communicated acquiescence. This the majority refuses to permit the jury to do solely because it would read the verbal exchange differently.

Even were only circumstantial evidence involved, the concerns raised in *Monsanto,* that drawing "an inference ... from highly ambiguous evidence" will erode the *Colgate* doctrine and eliminate distributors as an important source of information for manufacturers, *Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470, are not present in this case. The circumstances here do not suggest the likelihood that the manufacturer was simply responding to newly received information by implementing a preexisting policy. First, there was no evidence that James Jeans had a pre-existing policy of terminating price-cutting dealers; in fact one of its own sales representatives testified that he believed it was illegal to terminate a price-cutter. There was also evidence that James Jeans normally dealt with price-cutters in other ways. Second, there was considerable evidence that at the time of Handwerk's discussion with JJ's owner James Jeans was already well aware of The Jeanery's price-cutting policies; thus the dealer's complaint was not particularly informative. Third, the message conveyed by the retailer here—a threat to cease doing business unless a competitor is terminated—cannot be classified as simply informational in nature. The existence of an agreement between James Jeans and JJ's

to terminate The Jeanery is at least compelling circumstantial evidence of the existence of an underlying arrangement to maintain resale prices—an arrangement of which James Jeans and JJ's were a part.

There was considerable further evidence of the "something more" referred to in *Monsanto,* or the "other means which effect adherence to [the manufacturer's] resale prices" referred to in *Parke, Davis,* 362 U.S. at 49, 80 S.Ct. at 514. There was, for example, substantial evidence that James Jeans' tactics were far more sophisticated and disruptive than those permitted under *Monsanto.* James Jeans did not simply terminate dealers upon discovering that they did not sell at keystone. With respect to The Jeanery, James Jeans tried both rewards and punishments. Mr. Ballantyne testified that a James Jeans representative offered to supply The Jeanery with factory seconds and off-price merchandise in return for selling the popular new line of "Streets" jeans at full price. He also testified that the same representative repeatedly tried to "intimidate" him into selling at keystone.

In addition, other retail clothing dealers offered testimony as to the varying tactics that James Jeans used in trying to obtain their adherence to the keystone pricing policy. One dealer testified that he maintained James Jeans' resale prices because Nordstrom told him that his company had "ways of stopping anybody else from discounting," and that "[o]rders could be lost, could be shipped to the wrong destination, or just never processed."[8] Another retailer testified that in "[m]any different conversations" with James Jeans sales representatives, he was told that James Jeans had received complaints from other dealers about his discount prices, that it wanted him to sell at keystone, and that he would have difficulty getting his supplies in the future if he did not comply. When this

---

7. In *Monsanto,* the Court upheld the jury's finding of a conspiracy based on *"direct* evidence of agreements to maintain prices," even though that evidence was subject to lawful as well as unlawful interpretations. *Monsanto,* 465 U.S. at 765, 104 S.Ct. at 1471.

8. This parallels precisely what happened to The Jeanery: Its last order was not filled allegedly because James Jeans was out of stock or not in production, but The Jeanery offered persuasive evidence that these reasons were fictitious.

dealer refused to comply, James Jeans "lost" a $30,000 order from him.

The majority claims that James Jeans' various coercive tactics are "consistent with the privilege of independent action permitted a manufacturer under *Colgate."* Maj. at 1159. The majority gives no authority—and certainly none can be found in *Colgate* or *Monsanto*—for the position that a manufacturer may not only unilaterally terminate a dealer, but it may also use a variety of intermediate coercive tactics designed to disrupt the dealer's business operations, without fear of running afoul of the antitrust laws. The majority's view is contrary to the clear holding of *Parke, Davis;* the majority offers neither case law nor policy arguments for its extraordinary extension of the limited *Colgate* privilege.

James Jeans' conduct in attempting to conceal the fact that it had cut off future sales to The Jeanery also qualifies as "something more", as does its fabrication of a false reason for its failure to ship an order it had previously accepted. Attempting to conceal the fact of termination and contriving false reasons for not filling an order are probative of guilty knowledge and wrongful conduct. Here, these acts constitute further evidence that the termination of the Jeanery was undertaken as part of an unlawful resale price maintenance plan.

Finally, there was direct evidence of an agreement between James Jeans and The Jeanery to maintain the keystone price on the Street model. Mr. Ballantyne testified that he ultimately acquiesced in Nordstrom's demands regarding that line and advised him he would comply. The existence of this agreement may serve as some evidence of a general pattern of agreements between James Jeans and its dealers.

In sum, the above evidence constitutes substantial direct as well as circumstantial proof that James Jeans was a participant in a combination or conspiracy to maintain the retail price of its merchandise. *Cf. Monsanto,* 465 U.S. at 765, 104 S.Ct. at 1471. Thus, there was more than sufficient evidence before the jury to permit it to find a violation of Section One of the Sherman Act. Accordingly, in my opinion, the judgment notwithstanding the verdict cannot stand.

## BUSINESS ELECTRONICS AND THE PRICE–RELATED AGREEMENT

As noted at the outset, the original majority opinion relied exclusively on the argument that the Jeanery had not shown sufficient evidence of an agreement between James Jeans and JJ's to terminate The Jeanery's franchise. After the Supreme Court handed down *Business Electronics Corp. v. Sharp Electronics Corp.,* —— U.S. ——, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), the majority revised its opinion to add a second ground for its conclusion: insufficient evidence of a price-specific agreement between James Jeans and JJ. This second issue is not properly before us: it was not considered by the district court in its JNOV, and it was not raised by either party either before the district court or on appeal. *Cf.* maj. op. at 1155–56 n. 6. Moreover, even if the new ground could be raised for the first time now, on the theory that there has been a change in the law, the majority could not affirm on that basis. Rather, it would be required to remand in order to give the district court the initial opportunity to determine whether The Jeanery's evidence regarding a price-specific agreement was in fact insufficient. If upon remand, the district court were to decide that the evidence adduced at the original trial failed to meet the *Business Electronics* standard, JNOV would still not be proper; because the change in the law occurred after trial, The Jeanery would be entitled to a new trial at which it could present additional evidence. Thus, I do not believe *Business Electronics* can serve as a basis for affirming the district court's judgment. In my view, the majority's decision to uphold the JNOV must stand or fall on the basis of its original opinion.

I respectfully dissent.