954 F.2d 1470
 Kim Clay OVIATT, By and Through his conservator, Sr. Maria
Francis WAUGH, Plaintiff-Appellee,
v.
Fred PEARCE, Sheriff; Multnomah County, Defendants-Appellants.
Kim Clay OVIATT, By and Through his conservator, Sr. Maria
Francis WAUGH, Plaintiff-Appellant,
v.
Fred PEARCE, Sheriff; Multnomah County, Defendants-Appellees.
 Nos. 90-35146, 90-35314.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1991.
Decided Jan. 15, 1992.
 
 J. Michael Doyle, Asst. County Counsel, and Mark B. Williams, County Counsel, Portland, Or., for defendants-appellants-cross-appellees.
 Paul S. Bovarnick, Portland, Or., for plaintiff-appellee-cross-appellant.
 Appeal from the United States District Court for the District of Oregon.
 Before ALARCON, FERGUSON and HALL, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Plaintiff remained incarcerated in the Multnomah County Detention Center for 114 days before being arraigned after a court clerk dropped plaintiff's name from the arraignment docket sheet. He brought suit against Multnomah County Sheriff Fred Pearce, and Multnomah County, alleging violations of 42 U.S.C. § 1983 and Oregon's common law of false imprisonment. The jury awarded plaintiff a verdict of $65,000, and the district court awarded plaintiff $45,385.65 for attorney's fees under 42 U.S.C. § 1988. Defendants appeal the district court's denial of their motions for judgment notwithstanding the verdict, and its refusal to give several of their requested jury instructions. Plaintiff cross appeals, arguing that the district judge improperly failed to enhance his fee award, and that the judge should have granted a larger award for time spent preparing the fee application.
 
 
 2
 Both defendants' appeal and plaintiff's cross appeal are timely. See Fed.R.App.P. 4(a)(4), 4(a)(5). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.
 
 
 3
 * Plaintiff, who has been diagnosed as a schizophrenic, was arrested on August 2, 1985, and cited for unlawful use of a motor vehicle. After various court appearances, including an arraignment, a pretrial conference was set for January 8, 1986. When plaintiff failed to appear, a bench warrant was issued for his arrest. Plaintiff was arrested pursuant to this warrant on March 8, 1986. At that time, the Multnomah County Detention Center staff put plaintiff's charge information on the booking register for March 8. The booking register listed the time and date, March 10, 1986, of plaintiff's regularly scheduled arraignment to enable the jail staff to present plaintiff for the arraignment.
 
 
 4
 Multnomah County's computer system automatically prints the booking register for the Oregon state court system to use in docketing new inmates for arraignment. The warrant on which plaintiff was arrested was returned to the court on March 9, 1986. Unfortunately, the court clerk who prepared the docket sheet for March 10 failed to place plaintiff's name on the docket. As a result, he was not called for arraignment.
 
 
 5
 In June, a nurse who was treating plaintiff's schizophrenia discovered that he had been in jail since March without moving forward through the system. Plaintiff was arraigned on June 27, 1986, and released on July 1, 1986. Thus, plaintiff spent 114 days in jail without an arraignment, a bail hearing, or a trial.
 
 
 6
 At the time relevant to this lawsuit, Multnomah County's Corrections Division was administered by Sheriff Pearce, who was concededly the policymaker for Multnomah County. Pearce was aware that "from time to time" individuals were not arraigned because of mistakes made by the court or the jail. Nevertheless, the jail system had no internal procedures for keeping track of whether inmates had received an arraignment or attended other scheduled court appearances. Instead, the jail system relied on inmates, attorneys, family members, court personnel, and members of the jail staff (who had never been instructed to ask inmates whether they had been arraigned) to bring to the system's attention missed arraignments or court appearances.
 
 
 7
 Pearce had discussed the problem with colleagues occasionally, but took no steps to alleviate it. As defense counsel argued, "Pearce was convinced that it would be more trouble tha[n] it was worth given the nature of the problem because it involved small numbers of people."
 
 II
 
 8
 We now turn to defendants' contention that the district court erred by not granting their motion for JNOV on plaintiff's section 1983 claim. Defendants claim that plaintiff failed to establish a policy of deliberate indifference and the deprivation of a constitutional right.
 
 
 9
 The standard for reviewing a district court's refusal to grant a JNOV is the same as for a directed verdict. The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1151 (9th Cir.1988). The reviewing court's role is the same as the district court's. Id. "JNOV is proper if 'without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party' " cannot reasonably support a judgment in favor of the nonmoving party. Id. (citation omitted). This court may not "weigh the evidence or substitute its judgment for that of the jury," but rather must determine whether the verdict is supported by substantial evidence. The Jeanery, 849 F.2d at 1151; see Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.1985) (JNOV "is proper when the jury verdict is not supported by substantial evidence."), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).
 
 
 10
 A local governmental entity is liable under § 1983[1] when "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." Monell v. Department of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); see also City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Moreover, a local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights. City of Canton, 489 U.S. at 388, 109 S.Ct. at 1204.
 
 
 11
 To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation." City of Canton, 489 U.S. at 389-91, 109 S.Ct. at 1205-06.
 
 
 12
 * Plaintiff argues that he was deprived of "liberty" in contravention of the due process clause of the Fourteenth Amendment when the County of Multnomah incarcerated him for 114 days without a prompt court appearance.
 
 
 13
 We must first determine whether plaintiff possessed a liberty interest in being free from extended incarceration without any arraignment or pretrial procedure. Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); Dorfmont v. Brown, 913 F.2d 1399, 1403 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991). If he did, we must then determine what process is due under the Constitution. Hewitt, 459 U.S. at 472, 103 S.Ct. at 871; Toussaint v. McCarthy, 801 F.2d 1080, 1098 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).
 
 
 14
 "Liberty interests protected by the Fourteenth Amendment may arise from two sources--the Due Process Clause itself and the laws of the States." Hewitt, 459 U.S. at 466, 103 S.Ct. at 868-69 (citing Meachum v. Fano, 427 U.S. 215, 223-27, 96 S.Ct. 2532, 2537-39, 49 L.Ed.2d 451 (1976)). The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction. Baker v. McCollan, 443 U.S. 137, 144, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979) (although plaintiff "was indeed deprived of his liberty for a period of days," the deprivation was accomplished by due process); see Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (once defendant is convicted, he is constitutionally deprived of the liberty interest in being free from confinement). Indeed, the paradigmatic liberty interest under the due process clause is freedom from incarceration.
 
 
 15
 Plaintiff also claims that the state of Oregon, through the enactment of two statutes, has created a constitutionally protected liberty interest in being free from incarceration without a prompt pretrial court appearance. State laws "create[ ] a protected liberty interest by placing substantive limitations on official discretion." Olim, 461 U.S. at 249, 103 S.Ct. at 1747 (plaintiff must show state law contains particularized and objective standards or criteria). The state statutes in question must do more than merely channel administrative discretion; they must be "explicitly mandatory." Hewitt, 459 U.S. at 472, 103 S.Ct. at 871. In other words, "the ... law must direct that a given action will be taken or avoided only on the existence or nonexistence of specified substantive predicates." Toussaint, 801 F.2d at 1094. "[T]he word 'shall' alone is not sufficient. Rather, the liberty interest is created when the word 'shall' is used to mandate certain procedures...." Id. at 1098 (citing Hewitt, 459 U.S. at 472, 103 S.Ct. at 871).
 
 
 16
 In the instant case at least two applicable state statutes created a protected liberty interest. First, under Oregon Revised Statutes ("ORS") § 136.290, "a defendant shall not remain in custody pending commencement of the trial ... more than 60 days after the time of arrest unless the trial is continued with the express consent of the defendant." Id. (emphasis added). If no trial is commenced within the 60-day time period, "the court shall release the defendant...." Id. (emphasis added). The language of the statute contains objective criteria and requires mandatory action. Under its terms, there is no room for discretion.[2] The word "shall" and the particularized criteria combine to create a liberty interest in being free from incarceration without prompt pretrial and trial procedures.
 
 
 17
 The second statute, ORS § 135.010, also creates a constitutionally protected liberty interest. It provides: "Except for good cause shown ..., if the defendant is in custody, the arraignment shall be held during the first 36 hours of custody, excluding holidays, Saturdays and Sundays." Or.Rev.Stat. § 135.010. Again we see the presence of the word "shall" along with particularized criteria. There is no room for discretion in this specific directive. Before 36 hours have passed since the defendant's confinement, the court shall hold an arraignment.[3] As a result, this statute creates a liberty interest in freedom from incarceration without speedy pretrial procedures.
 
 
 18
 Having determined that plaintiff possessed a liberty interest, we now determine what process is due under the Fourteenth Amendment. "When a state ... creates a liberty interest [it] must follow minimum due process appropriate to the circumstances to ensure that liberty is not arbitrarily abrogated." Haygood v. Younger, 769 F.2d 1350, 1355 (9th Cir.1985) (citations omitted), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986).
 
 
 19
 Under Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), procedural protections are evaluated under a balancing test:
 
 
 20
 [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 21
 Id. at 335, 96 S.Ct. at 903. When the procedures in the instant case are evaluated under Mathews, they are found wanting.
 
 
 22
 The first factor under Mathews is the importance of the individual interest at stake. Here we are concerned with the liberty interest in freedom from incarceration without speedy pretrial procedures. Certainly freedom from incarceration is a vital liberty interest for those who have not been criminally convicted. It is a basic assumption with which we guide our lives: the state may not incarcerate any individual randomly and without specific protective procedures.
 
 
 23
 The second factor under Mathews has two components: the risk that the procedures used will erroneously deprive plaintiff of his liberty interest, and the value of additional or alternate procedural safeguards. The risk of an erroneous deprivation of plaintiff's liberty interest was enormous. The only check on clerical errors (and the check relied on by Multnomah County and its policymaker Sheriff Pearce) is protestation by the prisoner, his family, or his lawyer. Under Multnomah County policy, if a clerk dropped an inmate's name off of a docket sheet, and the inmate is unable to communicate his plight, or the inmate and his family were either out of touch or unaware of the inmate's legal rights, the inmate is simply out of luck.
 
 
 24
 Sheriff Pearce knew that some inmates were mentally impaired, that some inmates did not speak English and were unlikely to know of their legal rights, and that some inmates were not in contact with their families or lawyers. Indeed, defendants knew of at least 19 incidents between 1981 and 1989 in which individuals sat in jail for periods of undetermined length after missed arraignments. Given the total absence of procedures, it was highly probable that Multnomah County's "system" for keeping track of inmates would result in a prolonged deprivation of liberty without the statutorily mandated arraignment, a bail hearing, or the trial required within 60 days of incarceration under Oregon law.
 
 
 25
 With regard to the probable value of additional or alternate procedures, it is apparent that any number of procedures could have been used to locate inmates who have not appeared for arraignment. For example, the Multnomah County jail system is highly computerized, and each inmate has a computer file. Defendants admit that there are computer programs designed to prevent inmates from remaining in jail after missing a court appearance.[4] In addition, Sheriff Pearce admitted that the jail staff could compare the booking register with the court's arraignment list to discover inmates who have not received an arraignment. Indeed, a manual review of the list of inmates is conducted by Multnomah on a weekly basis, though for purposes unrelated to decreasing erroneous deprivations of liberty.[5] Thus, the defendants had available a choice of procedural safeguards that would have lessened the risk of erroneous deprivation of plaintiff's liberty interest.
 
 
 26
 The third factor under Mathews is the state's interest in maintaining current procedures, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail. Although Sheriff Pearce stated that in his experience modifications to computer systems were expensive, he admitted that he really had no idea how much a computer program that checked for long-term incarceration would cost, since he had never inquired into the matter. Moreover, the cost of a manual review of jail records cannot be prohibitive, since such a manual review currently is conducted on a weekly basis by the jail. The fact that this weekly check is already performed for purposes unrelated to detection of inmates who have missed their arraignment confirms the feasibility of such a procedure.
 
 
 27
 In short, the liberty interest in freedom from prolonged pre-arraignment incarceration is great, the risk of erroneous deprivation of that interest was great, and reasonable procedures for decreasing erroneous incarcerations were readily available. Under Mathews, Multnomah County's minimalist approach to jail procedure failed to provide inmates with the protection that they were due, and therefore contravened the Fourteenth Amendment.[6]
 
 B
 
 28
 "[O]nly deprivations visited pursuant to municipal 'custom' or 'policy' ... lead to municipal liability." City of Oklahoma City v. Tuttle, 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985) (discussing Monell, 436 U.S. at 690-92, 98 S.Ct. at 2035-36). Thus, plaintiff must demonstrate that the "system" used by Sheriff Pearce and the Multnomah County Jail were the result of an official policy. A "decision to adopt [a] particular course of action ... by th[e] government's authorized decisionmakers ... surely represents an act of official government 'policy.' " Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). In other words, a policy is "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483-84, 106 S.Ct. at 1300 (plurality opinion).
 
 
 29
 There is no question that Sheriff Pearce was the final policymaker with respect to internal procedures at Multnomah County Detention Center. There is also no question that the decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability. Sheriff Pearce knew that some inmates were not arraigned in the time required by Oregon law, but decided not to create any procedure to remedy the problem. After several meetings to discuss the problem, he made the conscious choice to continue to do nothing. Thus, the policy was one of inaction: wait and see if someone complains. It was a policy to keep the system that obviously did not work. The fact that Sheriff Pearce did not believe a strong enough pattern existed to warrant an "affirmative policy" does not weaken our conclusion that he had established a policy with regard to handling missed arraignments.
 
 C
 
 30
 The existence of a policy, without more, is insufficient to trigger local government liability under section 1983. City of Canton, 489 U.S. at 388-89, 109 S.Ct. at 1204. Under City of Canton, before a local government entity may be held liable for failing to act to preserve a constitutional right, plaintiff must demonstrate that the official policy "evidences a 'deliberate indifference' " to his constitutional rights. Id. at 389, 109 S.Ct. at 1205. This occurs when the need for more or different action "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." Id. at 390, 109 S.Ct. at 1205. Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury. See Davis v. Mason County, 927 F.2d 1473, 1482 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991).
 
 
 31
 In the instant case, the jury reasonably found that Multnomah County, through its policymaker Sheriff Pearce, was "deliberately indifferent" to the right of detainees not to be incarcerated without prompt pretrial procedures. Sheriff Pearce knew that some inmates could not communicate their plight or were out of touch with their families or lawyers. He also knew that "from time to time" some inmates remain incarcerated for a period of time because they missed their arraignments. Specifically, Sheriff Pearce knew of at least 19 incidents between 1981 and 1989 in which individuals sat in jail for periods of undetermined length after they missed arraignment. Given the lack of procedures to alleviate this problem, it was virtually certain that some inmates would, as a result, be erroneously deprived of their liberty.[7] The need for different procedures was so obvious that Sheriff Pearce's adamant refusal to take action amounted to deliberate indifference to the detainees' constitutional rights.[8]
 
 D
 
 32
 Finally, plaintiff must demonstrate that defendants' policy was "closely related to the ultimate injury." City of Canton, 489 U.S. at 391, 109 S.Ct. at 1206; Tuttle, 471 U.S. at 823, 105 S.Ct. at 2436 ("Monell must be taken to require ... that a particular violation was 'caused' by the municipal 'policy.' ").
 
 
 33
 Defendants contend that plaintiff did not establish an affirmative link between his deprivation of liberty and any official policy. Instead, they argue that the true "cause" of plaintiff's missed arraignment and prolonged incarceration was the court's clerical error. Defendants misunderstand the law. Plaintiff need only demonstrate that "the identified deficiency ... [is] closely related to the ultimate injury." City of Canton, 489 U.S. at 391, 109 S.Ct. at 1206. Specifically, plaintiff must prove that the injury would have been avoided had Multnomah County instituted some affirmative procedure designed to discover inmates who had missed arraignments. Id.
 
 
 34
 In the instant case, the facts support a jury finding that the "constitutional tort" committed against plaintiff was closely related to Multnomah County's policy of deliberate indifference.[9] Multnomah County, through Sheriff Pearce, could have instituted several procedures to detect inmates who have not received an arraignment. Manual comparisons between the court's docket sheet and Multnomah County's daily booking sheet would have been easy to administer and very inexpensive. Moreover, Multnomah County could have acquired a computer program that would have enabled them to discover which inmates had not received an arraignment. If Multnomah County had a policy of conducting the manual comparison, or had installed the computer program, it is unlikely that plaintiff would have spent 114 days in jail without an arraignment, a bail hearing, or a trial. Thus, with proper procedures, Multnomah County would have been able to avoid plaintiff's prolonged, unconstitutional incarceration.
 
 
 35
 We hold that with the evidence established at trial, a reasonable jury could conclude that the likelihood of unjustified incarceration was so obvious that defendants' policy with regard to detecting prolonged incarceration without prompt pretrial procedures evidenced deliberate indifference to the rights of inmates, thus triggering liability under section 1983. As such, the district court properly denied defendants' motion for JNOV on plaintiff's section 1983 claim.
 
 III
 
 36
 Defendants next contend that the district court erred when it declined to grant their motion for JNOV on plaintiff's pendent state claim for false imprisonment. A district court's interpretation of state law is reviewed under the same independent de novo standard as are questions of federal law. Matter of McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 
 37
 * Both parties agree that false imprisonment requires, at a minimum, (1) that defendant must confine plaintiff, (2) that plaintiff must be aware of the confinement, and (3) that the confinement must be unlawful. They disagree, however, whether scienter, or intent, is a required element.
 
 
 38
 Defendants argue that they cannot be held liable for false imprisonment under Oregon law unless plaintiff demonstrates they intended to confine plaintiff wrongfully. Under defendants' view, intent consists of knowledge that the confinement is wrongful. While they are correct that under Oregon law, intent is an element of false imprisonment, defendants misunderstand that requirement. In Roberts v. Coleman, 228 Or. 286, 365 P.2d 79 (1961), the Oregon Supreme Court outlined all elements necessary to show false imprisonment. The court stated that the defendants' "act must be done with the intent to confine the plaintiff and must be the legal cause of confinement." Id., 365 P.2d at 83 (citing Restatement of Torts § 35, et seq.) (emphasis added). The plain language reveals that the defendants must only intend to accomplish the act that causes confinement; they need not intend the confinement to be unlawful. See also Restatement (Second) of Torts § 44 (1965) ("to make the actor liable, ... it is only necessary that he intend to confine the other.... The actor's motives in so confining the other are immaterial.") (emphasis added); accord Bryan v. Jones, 530 F.2d 1210, 1213 (5th Cir.) (section 1983 case following Restatement and holding that intent to confine without legal authority is not a necessary element of false imprisonment), cert. denied, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976). Thus, the intent element relates only to the fact of confinement, not the element of unlawfulness. See Roberts, 365 P.2d at 85 (holding that "no act of the defendants shows an intent to confine the plaintiff within the boundaries of the office.") (emphasis added). Any other conclusion would condone wrongful confinement of undetermined length provided that the defendant, while intending to commit the acts that restrain plaintiff's freedom, does not intend unlawful confinement.
 
 
 39
 Defendants rely on Walker v. City of Portland, 71 Or.App. 693, 693 P.2d 1349 (1985), as support for their contention that intent includes knowledge that the confinement is wrongful. Their reliance is misplaced because Walker does not address the question of intent. Rather, in determining whether summary judgment was properly granted for the defendant, the court had to decide whether the facts alleged by the plaintiff, if believed, could sustain a finding of false imprisonment. Plaintiff argued that although his initial detention was lawful, further detention became unlawful when the officers learned from several witnesses, including the victim, that plaintiff was not the assailant. Id., 693 P.2d at 1352. The court held that if the jury believed these facts, defendants would be liable for false imprisonment because the detainment became unlawful once reasonable suspicion had dissipated. The court did not need to decide whether intent to confine wrongfully was a necessary element of false imprisonment, nor did the court attempt to so hold.[10] Its only task was to decide whether, on plaintiff's alleged facts, defendants could be liable for false imprisonment. Because Walker does not address or answer the question of what intent is required to state the tort of false imprisonment, it is of little help to defendants.[11]
 
 
 40
 In this case, a reasonable jury could conclude that plaintiff established a claim for false imprisonment. First, plaintiff clearly was confined. Its policy of inaction caused the confinement because Multnomah County could have taken any number of reasonable measures to keep track of its inmates. Second, although plaintiff was unable to communicate his plight, he was aware that he was confined. Third, the incarceration was unlawful under ORS § 136.290, which requires that a defendant either be tried within 60 days or released, and under ORS § 135.010, which provides a defendant with the right to a prompt pretrial court appearance. Finally, defendants' deliberate indifference to plaintiff's right to freedom from prolonged incarceration without prompt procedures establishes the necessary intent. Defendants' decision to maintain a policy that admittedly did not detect a missed arraignment in plaintiff's situation is tantamount to an intent to confine those individuals who have a right to be released.
 
 
 41
 We hold that, on these facts, a reasonable jury could find defendants liable for false imprisonment. Thus, the district court did not err in refusing to grant defendants' motion for JNOV on plaintiff's state law claim.
 
 B
 
 42
 Defendants argue that even if plaintiff makes out a claim for false imprisonment, they nonetheless are immune from liability under the Oregon Tort Claims Act. ORS § 30.265 provides, in relevant part:
 
 
 43
 (3) Every public body and its officers, employees and agents acting within the scope of their employment or duties, ... are immune from liability for:
 
 
 44
 (c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.
 
 
 45
 Or.Rev.Stat. § 30.265(3)(c).
 
 
 46
 We believe that under Oregon case law, state actors are not immunized for their intentional acts. In Crosby v. SAIF Corp., 73 Or.App. 372, 699 P.2d 198 (1985), the Oregon Court of Appeals held that the tort of civil conspiracy, because of its intentional nature, was not immune under the Tort Claims Act. Id., 699 P.2d at 201. The court reasoned that "conspiring with an employer ... to eliminate a worker's entitlement to benefits is not a matter of discretion." Id. Admittedly, while the court stated that the defendant "cites no authority for the proposition that intentional torts that involve unlawful conduct can be immune under ORS 30.265(3)(c)," its holding did not extend that far. Nevertheless, we believe that an Oregon court faced with this issue would hold that intentional torts are not immune from liability. Accordingly, defendants are not immune under the Tort Claims Act because acting with deliberate indifference with regard to an inmate's constitutional rights is not a matter of discretion.
 
 IV
 
 47
 Defendants next take issue with the jury instructions. Jury instructions are considered as a whole to determine if they are misleading or inadequate. United States v. Beltran-Rios, 878 F.2d 1208, 1214 (9th Cir.1989). "The trial judge has substantial latitude in tailoring the instructions, and challenges to the formulation adopted by the court are reviewed for abuse of discretion." Id. The reviewing court's inquiry is "whether, considering the charges as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading." Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988).
 
 
 48
 Defendants argue that the district court improperly instructed the jury regarding the section 1983 claim when it failed to state that the causation element required a "direct link" between the policy and the constitutional injury. Defendants do not reveal, however, the source of this linguistic requirement. The district court instructed the jury that "in order for [the policy] to be the cause of injury, you must find that it is so closely related as to be the moving force causing the ultimate injury." Because this instruction closely tracks the language in City of Canton, we find that it correctly stated the law and adequately covered the issue of causation. See City of Canton, 489 U.S. at 391, 109 S.Ct. at 1206 ("the identified deficiency in a city's training program must be closely related to the ultimate injury."). (emphasis in original).
 
 
 49
 Defendants also argue that the district court did not clearly instruct the jury regarding the issue of respondeat superior. The instructions are very explicit, however, that the jury may not find Multnomah County liable "solely because it employs defendant Pearce. The County is liable for Pearce's action only if he was acting pursuant to his official county policy or custom." Defendants argue that the court should have explained the doctrine as it relates to those employees who work for Pearce. Because only Pearce's actions are the subject of the instant suit, the instructions adequately apprised the jury that it could not hold the County liable on a respondeat superior theory.
 
 
 50
 Finally, defendants challenge the false imprisonment instruction on the ground that it did not state that defendants may be liable only if they knew plaintiff was incarcerated unlawfully. As we discussed above, intent to confine unlawfully is not an element of false imprisonment. Rather, the intent is to do the acts resulting in confinement. The court instructed the jury that plaintiff had been detained, that the detention was unlawful under Oregon law, and that "plaintiff must show by a preponderance of the evidence that the unlawful detention was pursuant to the actions, or inaction, of the County and Sheriff Pearce." We hold that the jury instructions fairly and adequately covered the issue of false imprisonment.
 
 V
 
 51
 Finally, we consider plaintiff's contention that the district court abused its discretion in determining the attorney's fee award. Attorney's fees awards made pursuant to 42 U.S.C. § 1988 are generally reviewed for abuse of discretion. See Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); Hardin v. White Mountain Apache Tribe, 779 F.2d 476, 480 (9th Cir.1985). However, "any elements of legal analysis and statutory interpretation which figure in the district court's decisions are reviewed de novo." Hall v. Bolger, 768 F.2d 1148, 1150 (9th Cir.1985) (citations omitted).
 
 
 52
 Section 1988 authorizes the district courts to award a reasonable attorney's fee to prevailing parties in civil rights litigation. 42 U.S.C. § 1988. "The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances." Hensley, 461 U.S. at 429, 103 S.Ct. at 1937 (quotation omitted). "Congress has elected to encourage meritorious civil rights claims because of the benefits of such litigation for the named plaintiff and for society at large...." Blanchard v. Bergeron, 489 U.S. 87, 96, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989).
 
 
 53
 Following the proper procedure, the district court first determined the reasonable rate of compensation and the reasonable number of hours worked. Hensley, 461 U.S. at 433-37, 103 S.Ct. at 1939-41. It then multiplied hours by rate to arrive at the presumptively reasonable fee that is known as the "lodestar" figure. Id. The district court declined to adjust this fee upward to reflect the risk inherent in plaintiff's action by applying a multiplier of 2.0 to the "lodestar" figure.
 
 
 54
 The plaintiff does not dispute the district court's calculation of the "lodestar" figure for the pretrial and trial periods. The plaintiff does dispute, however, the district court's grant of attorney's fees on two other grounds: First, plaintiff claims that the district court should have enhanced the "lodestar" amount to account for the risk faced by plaintiff's attorney. Second, plaintiff claims that the district court should have given him credit for at least 21 hours of work in preparing the fee application.
 
 
 55
 We do not believe that the district court abused its discretion when it declined to enhance plaintiff's attorney's fee award. There is a strong presumption that the lodestar figure is reasonable, and adjustments are to be adopted only in exceptional cases. Cunningham v. County of Los Angeles, 879 F.2d 481, 487-88 (9th Cir.1989), cert. denied, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).
 
 
 56
 The Ninth Circuit has upheld a district court's application of a multiplier to the lodestar figure to enhance fees to account for the contingent nature of a Title VII action. In Fadhl v. City of San Francisco, 859 F.2d 649, 650 (9th Cir.1988), the plaintiff was forced to approach 35 attorneys before she found one who would accept her case. Id. at 651. The court held that district courts must base an enhancement of the "lodestar" for contingency on two factors:
 
 
 57
 First, the fee applicant must establish that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market. Second, any enhancement for contingency must reflect the difference in market treatment of contingent fee cases as a class, rather than the riskiness of any particular case.
 
 
 58
 Id. at 650 (citations and quotations omitted).
 
 
 59
 Thus, "[e]nhancements ... are only appropriate when supported by a showing that such enhancement is necessary to attract competent counsel in the relevant community for the class of cases in question." Merritt v. Mackey, 932 F.2d 1317, 1324 (9th Cir.1991) (citations and quotations omitted) (reversing a district court's enhancement that was based on an action's riskiness). Plaintiff has not shown that, without an enhancement, plaintiffs in similar cases will face substantial difficulties in finding counsel. As the district court noted, plaintiff had no trouble finding counsel, even though the possibility of an enhancement of the lodestar amount was far from certain. Thus, there is little reason to think that similarly situated plaintiffs will have difficulty absent enhancements.[12]
 
 
 60
 The district court also did not abuse its discretion when it limited the plaintiff to ten hours reasonably expended on the fee request, since the parties had stipulated to the "lodestar" amount. Thus, we agree with the district court that the stipulation rendered plaintiff's task in preparing the fee petition relatively straightforward. As such, the attorney's fee award made by the district court is affirmed.
 
 
 61
 Turning to the final issue, plaintiff is entitled to a reasonable attorney's fee on appeal because he is the prevailing party with regard to defendants' appeal. Because plaintiff did not prevail on his own cross appeal, he is not entitled to attorney's fees for the time spent in connection therewith. See Cabrales v. County of Los Angeles, 935 F.2d 1050, 1053 (9th Cir.1991) ("If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim--even though she may have suffered some adverse rulings").
 
 VI
 
 62
 The judgment of the district court and its award of attorney's fees is AFFIRMED. The plaintiff is entitled to reasonable attorney's fees for successfully opposing defendant's appeal.
 
 
 
 [1]
 Section 1983 provides that
 Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....
 42 U.S.C. § 1983.
 
 
 [2]
 The court has the choice of releasing the defendant "on the own recognizance of the defendant, or in the custody of a third party, or upon whatever additional reasonable terms and conditions the court deems just as provided in ORS 135.230 to 135.290." Or.Rev.Stat. § 136.290. These alternatives do not render the statute discretionary, because while the court may state the terms and conditions of release, it has no choice but to release any defendant who is confined more than 60 days pending commencement of trial
 
 
 [3]
 At oral argument, defendants strenuously argued that plaintiff had no right to an arraignment under Oregon law. Because plaintiff had been arraigned prior to his arrest pursuant to the bench warrant, he was not entitled to an arraignment under ORS § 135.010. Thus, they contended that this statute did not create a liberty interest applicable to plaintiff. In their briefs, however, defendants continuously refer to plaintiff's missed court appearance as an "arraignment" and never contested plaintiff's right to one under Oregon law
 Even if defendants are correct that plaintiff had no right to an arraignment, he nonetheless had a liberty interest pursuant to ORS § 136.290 and the due process clause of the Fourteenth Amendment. Moreover, because plaintiff was confined pursuant to a bench warrant, he was entitled to a speedy court appearance to determine whether he should be released pending trial. See Or.Rev.Stat. § 135.245(1) ("a person in custody shall have the immediate right to security release or shall be taken before a magistrate without undue delay."); Or.Rev.Stat. § 131.005 ("function of a bench warrant is to achieve the court appearance of a defendant in a criminal action for some purpose other than the initial arraignment"). He therefore was entitled to some type of court appearance, and this right created a liberty interest.
 
 
 [4]
 In their brief, defendants state that the computer system "does not eliminate human error." Defendants also state that "Sheriff Pearce believed that it would be extremely difficult to develop some kind of fail safe method that would somehow overcome all human error." Defendants misunderstand the problem. The issue is not whether defendants could develop a foolproof system, but whether defendants were required to have some check on the ability of a single clerical error to result in prolonged incarceration without arraignment, a bail hearing, or a trial
 
 
 [5]
 Both parties were unsure of the purpose of this weekly manual review. At oral argument, defendants surmised that it was conducted to maintain population at a specific level. Plaintiff, on the other hand, thought the purpose of the check was to see if jurisdiction was proper or to see if any inmates should be released
 
 
 [6]
 Defendants' reliance on United States v. Gelfuso, 838 F.2d 358 (9th Cir.1988), is misplaced because it has little relevance to the present case. In Gelfuso, the Ninth Circuit held that a ten month pretrial detention pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3142, did not violate due process. Id. at 359. The purpose of the detention was to ensure Gelfuso's appearance at trial and the safety of the community. Id. Unlike the present case, Gelfuso was detained only after the strict procedures set forth in the Bail Reform Act had been observed. Moreover, while the court did not find a due process violation under those circumstances, it expressly declined to "decide whether, absent the government's lack of responsibility for pretrial delay, preventive detention under the Bail Reform Act of ten months" would violate the strictures of due process. Id. (emphasis added). Because the local government is responsible for the prolonged incarceration in the present case, Gelfuso does not govern our decision
 
 
 [7]
 In fact, defendants admit that "the evidence showed that the injury suffered by plaintiff was foreseeable."
 
 
 [8]
 Defendants rely on Redman v. County of San Diego, 896 F.2d 362 (9th Cir.1990), rev'd, 942 F.2d 1435 (9th Cir.1991) (en banc). Redman does not support defendant's position for two reasons. First, the en banc panel reversed the decision, holding that the County had acted with deliberate indifference to an inmate's constitutional right to personal security. Redman, 942 F.2d at 1445. Second, the case did not concern an alleged failure to train, but rather the proper culpability level for violations of a detainee's right to personal security. See id. at 1439
 
 
 [9]
 At oral argument, defendants admitted that under the jail's current system, the only thing that would have prevented plaintiff's prolonged incarceration is the absence of a mistake by the court clerk. Thus, defendants implicitly admit that the procedure used by the jail was insufficient to prevent plaintiff's injury
 
 
 [10]
 Indeed, Walker is an easy case for false imprisonment because the police officers clearly intended to detain plaintiff after the plaintiff was cleared of suspicion. Nowhere in the opinion, however, does the court indicate that its decision turned on whether the police officers knew that further detainment was unlawful. See id. at 1352-53
 
 
 [11]
 Defendants also rely on Higgins v. Redding, 34 Or.App. 1029, 580 P.2d 580, 582 (1978). Higgins is of little help to defendants because it addressed whether Multnomah County had caused the false imprisonment, rather than whether the County had a "knowing" mental state. Even on the issue of causation, Higgins is inapposite because in that case, Multnomah County had not caused the false imprisonment since there was nothing that the County could have done to avoid it. In the instant case, however, Multnomah County did cause the false imprisonment since, as discussed above, it could have taken any number of reasonable measures to keep track of jail inmates
 
 
 [12]
 Plaintiff offered a number of affidavits, but these affidavits are conclusory and were executed by plaintiff-side civil rights attorneys, who are not unbiased observers in these matters. For example, Lee Aronson, a partner with an Oregon law firm, stated:
 [b]ecause of the character of [civil rights] plaintiff[s] and the situation[s] out of which the cases usually arise[, and] because of the high risk involved and the need to advance costs which might never be recovered, it is my understanding that few attorneys will take on such cases without the likelihood of recovery of attorney's fees at a reasonable hourly rate with a multiplying factor.